## LOUIS ROBLES *v.* THE STATE.

1. CONTINUANCE. —Process for witnesses must be sued out in a reasonable time, and the application must disclose to whom and when delivered. Nothing is to be presumed in aid of an application for a continuance. In this case the application does not show due diligence to procure the testimony; is indefinite as to time; and fatally defective in not showing what became of the attachment after it was issued.

2. VENIRE — SERVICE. — Service of a copy of the names of persons summoned on a special *venire facias* may be had upon the defendant at any time after indictment, whether before or after arraignment; but he cannot, unless he waives the right, be brought to trial until he has had one day's service of the copy.

3. JURY — SPECIAL VENIRE. — The court has no power to excuse jurors summoned on a special *venire*, until they have appeared at the time and place designated in the *venire facias*. And in forming the jury in a capital case, the jurors must be called and tested in the order in which their names

appear on the *venire facias;* and they cannot be excused for cause or exemption, or challenged, until their names are so called.

4. Same — Case Stated. — At the trial of a capital case, several persons summoned on the special *venire* failed to appear and answer to their names, and the court announced that they had been excused because, on the calling of a previous *venire* in another case, they had shown and claimed their exemption from jury-service, and had notified the court that they would claim it in this case. *Held,* not within the competency of the court to thus excuse them in advance.

5. Same — Competency. — One who "rents a room, and boards," is a competent juror, and is a householder within the meaning of the statute.

6. Homicide — Charge of the Court. — If, in a trial for murder, the facts proved raised a doubt whether the jury might find the homicide to be manslaughter or justifiable homicide, then the court should charge the law pertinent thereto, and give the jury an opportunity to pass upon the doubt.

7. Transcript — Clerical Errors. — The indictment, as copied into the transcript, charges the offence to have been committed in the year "one thousand, eight thousand, eight hundred and seventy-four." However manifest it may be that this mistake was made in transcribing the indictment, this court should reverse the judgment for this error alone, because the offence is charged to have been committed subsequent to the indictment.

Appeal from the District Court of Nueces. Tried below before the Hon. J. C. Russell.

On November 8, 1878, the appellant was indicted for the murder of Anesto Moreno, on November 28, "one thousand, eight thousand, eight hundred and seventy-four" (as copied in the transcript), in Nueces County. He was put upon his trial on the 19th day of the same month, was convicted of murder in the second degree, and his punishment assessed at ten years in the penitentiary.

Mateo de la Hoya, for the State, testified that in November, 1874, he was keeping store at Preseños Rancho, in Nueces County, Texas. That, on the day of the killing, himself and deceased were standing in the store door when appellant rode up and accused deceased of having his (appellant's) horse. Deceased replied that the corporal, or

man in charge of the horses, had loaned him the horse. Deceased had been drinking. After remaining at the store some time, deceased took appellant by the arm and took him out of the store. Deceased, while in the store, kept up a wrangling and quarrelling with appellant, telling him that he (appellant) was a man only at the Ranchos Santa Gertrudes and Butieras, while he (deceased) was a man everywhere. Deceased pushed a whip upon appellant's arm as he took him out. In a few minutes witness heard a shot, but, being very busy, did not go out. Soon afterwards, saw Maldonado take deceased, holding his arm, to his (Maldonado's) house. Witness then, seeing that deceased was wounded, sent a man to San Diego to notify the justice of the peace of the affair. Did nothing more, except furnish a box in which to bury the deceased after he died that night. Deceased was shot in the left side, and had a wound on the head as though struck by the hammer of a pistol. Witness saw no arms about the person of deceased during the day. When witness started the man to the justice, appellant remarked that the sending was unnecessary, as he was going to give himself up. Appellant had a pistol in his boot. Appellant was not present when deceased died, and witness does not know whether he was at San Diego at the time, or *en route*.

On cross-examination, witness said the horse in dispute belonged to Capt. King; that appellant was a corporal employed by Capt. King. Deceased told appellant that he borrowed the horse from a herdsman. Knows of no quarrel, other than this about the horse, between the parties. The deceased came to witness's store a short time before appellant; was very drunk. And witness also swears that deceased and appellant drank together at the store

Francisco Patiño, for the State, testified that he was the clerk of the last witness, and was at the store when the killing occurred. Deceased on that day purchased goods and

liquor at the store, and was there when appellant and one Gregorio Cruz came to the store. Appellant claimed a horse that deceased had, belonging to Capt. King. Witness does not know what reply deceased made to appellant, but saw deceased, appellant, and Cruz drinking together of the liquor purchased by deceased. Deceased then slipped his whip on his arm, laid his blanket on the counter, took appellant by one arm, and said, "If you are a man come outside." The two went outside, and shortly witness heard the shot. In five or six minutes, saw Maldonado taking deceased to his (Maldonado's) house. Deceased, when afterwards seen by witness, was wounded in the head and side. Deceased told witness he could not recover, and, though drunk when he was shot, knew what he was talking about. Told witness that he had nothing against accused. Witness saw no weapons on deceased that day. Appellant had a pistol stuck in his boot.

Anastacio Gomez testifies, for the State, that, when he got to the store, deceased and appellant were talking about a horse, — deceased very angry. Saw them quarrelling and drinking together, and afterwards saw them go out together, as described by other witnesses, and heard the firing. On cross-examination, says that he went to San Diego with appellant, when appellant went to give himself up to the justice of the peace.

Salome Maldonado, on the part of the prosecution, states that, in 1874, he lived in a house near and opposite the store where the shooting took place; that, a day or two before the occurrence, appellant came to his house and directed him (witness) to get a horse for him (appellant) that was running with a lot of mares belonging to the rancho, which horse was the property of Capt. King. On the day of the killing, witness had saddled a horse, to do as directed by appellant, and, whilst eating breakfast before starting out, witness heard a pistol-shot, and was then told

there had been a " fuss " at the store. Witness then went
to the back of the store and found deceased, who asked
witness to take him (deceased) up, and carry him to wit-
ness's house, which witness did, leaving deceased there, and
directing those about to allow no one to enter the house
until witness returned. Witness then went to the store and
told all persons there that if any of them had anything to
do with the shooting, not to go about the wounded man.
Appellant told the witness, then, that what he had done was
on account of a horse deceased claimed, which belonged to
Capt. King, and that deceased had forced the quarrel on
him (appellant). Appellant was at the store door when
witness carried deceased off as stated. Witness had no
talk with appellant after that detailed. Deceased would
not talk with witness about the shooting. Witness then
went after the horse, and on returning found deceased so
weak that witness could not understand what he would
attempt to say. Saw witnesses Hoya and Patiño at his
house after he returned from hunting the horse, but not
before. Does not remember that deceased told the two
witnesses spoken of who it was shot him. Deceased
seemed to be out of his right mind, and could hardly be
understood. Deceased had on a blanket when witness
found him, but no arms. The State closed.

Defendant then introduced Antonia Medina, who testified
that she had known appellant since he was a child. Did
not know deceased, and knows nothing of the shooting.
On the third day after the shooting, as she was passing
home by the rear of the store-house where the shooting was
said to have been done, she found a butcher-knife, with blade
about nine inches long, and a black handle. Witness took
the knife home, but has lost it long since. Does not know to
whom it belonged. Did not see Ylario Galvan on that day,
except at her house.

On cross-examination, witness says that she heard no

shooting on the day the affair happened. She lives some distance from the store; does not know how far, and there are houses between her residence and the store. She took the knife home, but showed it to no one, and does not know to whom it belonged. There is a lane passing by the store, and it was a short ways from the path that she found the knife. It was not hidden by weeds, but lying in the dust. Had never seen the knife before.

Candelario Gonzales testified, for the defence, that he had known appellant for twelve years, and that appellant, at the time of the killing, was " corporal " for Capt. King. Had known deceased about two months before his death, and saw him last at the Preseños Rancho. Remembers when deceased died, but does not remember the date; thinks it was in November, 1874. Witness was employed by Capt. King, and was under appellant. Appellant took witness with him to the store on the day of the killing, to carry supplies back to the camp near the rancho. Deceased came up to the store, on a horse belonging to Capt. King, when appellant asked him where he had got that horse. Deceased would not answer satisfactorily, saying only that he had borrowed it from one of the men who had charge of the stable-horses. As appellant and deceased went into the store together, witness noticed that deceased had a knife with a black handle thrust into his belt. The blade was wrapped in a handkerchief or piece of cloth, and seemed about nine inches long. Witness then, having received the supplies, left the store and returned to camp.

On cross-examination, witness says appellant and himself went to the store on foot, and met the deceased at the door. Appellant first spoke, asking deceased about the horse, when deceased answered that it was none of appellant's business how the horse was obtained. Witness left appellant and deceased inside the store. When witness had crossed a creek, on his way to camp, he saw deceased and appellant

come out of the store, deceased having hold of appellant's arm. Did not know where they were going. Witness judged of the size of the knife on deceased, which was worn on the right side, from its appearance and bulk. Appellant had charge of a party encamped near the rancho, hunting up Capt. King's horses, to which party witness belonged.

The opinion discloses the facts pertinent to the questions of practice.

*Pat O'Docherty* and *F. E. Macmanus*, for the appellant.

*W. B. Dunham*, Assistant Attorney-General, for the State.

Ector, P. J.    The defendant was indicted at the October term, 1878, of the District Court of Nueces County, for the murder of one Anesto Moreno.    He was tried at the same term of the court, convicted of murder in the second degree, and his punishment assessed at ten years' confinement in the State penitentiary.    The case is now before this court on appeal, and the defendant has assigned the following errors, to wit:

"1. The court erred in refusing to grant the defendant a continuance in this case, on his affidavit and motion therefor.

"2. The court erred in excusing, on its own motion, persons drawn as jurors in this cause, whose names had been served upon the defendant in the copy of the *venire* from which the defendant was to select a jury.

"3. The court erred in this : that a *venire* of sixty persons, qualified jurors, was ordered by the court for the trial of the cause ; that sixty jurors were drawn, and a copy of the *venire* thus drawn was served upon the defendant ; that

many persons on said *venire* were excused by the court, on account of disqualifications and exemptions known to the court, without requiring their personal attendance in court and their qualifications tested ; and that by such action of the court the number of persons on the *venire* was reduced below the number required by law and the order of the court for said special *venire,* and the defendant was deprived of his right to have a *venire* of sixty legally qualified jurors tendered to him from which to select a jury.

" 4. The court erred in its ruling as to the qualifications of George Godshall, and thereby deprived the defendant of the benefit of one of his peremptory challenges.

" 5. The court erred in its rulings as to the formation of the jury in this cause, and thereby compelled the defendant to exhaust his peremptory challenges, and accept as a juror Leonard Webber, who was not an acceptable juror for the defendant.

" 6. The court erred in requiring the defendant to pass upon the jury in this case before an arraignment was had in the cause, and in requiring the defendant, after he had accepted eleven jurors, to be arraigned and plead to the indictment, and to accept the jurors then selected, without tendering to the defendant a new *venire.*

" 7. The court erred in its instructions to the jury, in that the court did not instruct the jury as to the law of *manslaughter* and of excusable homicide, the facts of the cause being of such a character as to authorize the jury in finding a verdict of manslaughter or in acquitting the defendant.

" 8. The court erred in refusing a new trial in the case on the grounds set forth in the motion of defendant therefor."

In his application for a continuance, the defendant says he cannot go to trial at this term of the court on account of the absence of the witness Ylario Galvan, who resides in

Duval County, Texas; that he caused an attachment to be issued for the witness to Duval County; that he expects to prove by the said witness Ylario Galvan that he (Galvan) was present on the day that the deceased, Anesto Moreno, met this defendant, being the same day that the said Moreno received the wound that caused his death; that on the said day Moreno was armed with a knife, commonly called a "*belduque*," and that the same was in his belt at the time he met and addressed the defendant; that this witness was present during the entire conversation which took place between the defendant and deceased, previous to his receiving the fatal wound; that, on the day following the service of a copy of the *venire* in this cause upon him, he caused an attachment to be issued to Duval County. The witness is not absent by the procurement or consent of this defendant, and this application is not made for delay.

The court below properly overruled defendant's application for a continuance. It does not state when defendant was served with a copy of the *venire*. The indictment was filed on November 8, 1878, and the defendant was arraigned on the 19th day of the same month. Our Code of Criminal Procedure provides, that "no defendant in a capital case shall be brought to trial until he has had one day's service of a copy of the names of persons summoned under a special *venire facias*, except when he waives the right. But the service may be made at any time after indictment found, whether before or after arraignment." Pasc. Dig., art. 3022. The application does not show due diligence to procure the testimony of the absent witness, and is altogether too indefinite as to time. It is further fatally defective in not stating what became of the attachment after it was issued. Process for witnesses must be sued out in a reasonable time, and the application disclose to whom and where delivered. Nothing is to be presumed, in aid of an

application for a continuance.  *Bowen* v. *The State*, 3 Texas Ct. App. 617 ; *Murray* v. *The State*, 1 Texas Ct. App. 417 ; *Townsend* v. *The State*, 41 Texas, 134.

We will consider the second and third errors assigned, together.

It appears from a bill of exceptions taken in the cause, that, on calling the special *venire* drawn herein (a copy of the persons' names had been served upon the defendant), several persons whose names appeared on said *venire* did not answer to their names, and, the attention of the court having been called to this fact, the court stated that it had excused several of said absentees, on various grounds.  The defendant objected to this action of the court in excusing thus, of its own motion, any one who had been summoned on the special *venire* in this case, without such parties appearing and being examined as to their qualifications ; which objection was overruled by the court, and to which ruling the defendant excepted, and tendered a bill of exceptions, which is bill of exceptions No. 2.  "And it further appearing that the following named persons upon said *venire* did not answer to their names, when called in their regular order, in proceeding to organize the jury to try this case, viz., Julius Henry, George F. Everns, and E. Morris, the court also stated that, of its own motion, it had excused said last-mentioned jurors, on the ground that they belong to a fire company of the city of Corpus Christi, and were exempt from jury-service ; to which ruling of the court defendant excepted, and tendered a bill of exceptions," which bill of exceptions is No. 4.  These bills of exceptions were allowed and approved by the court, with the following explanations, to wit :  " In the second section of said bill, the parties excused had appeared before the court on other special *venires*, and had urged their respective exemptions from all jury-service, which were allowed by the court ; and the said persons then informed the court that they would claim

their respective exemptions in every case in which they were called upon to serve, and then asked the court if they would be required to appear on the two next special *venires*, when they were informed by the court that they would each be excused from attendance, as the court had no authority to compel them to serve." * * * And section 4 of said bill of exceptions is also explained as follows, to wit: " The parties named in section 4 had appeared and claimed their exemption, and had been excused under the same circumstances as were those jurors in section 2 above; and said jurors having been informed by the court that they need not appear any more during said court, the list of firemen exempted by law having been filed with the clerk of the District Court, May 19, 1877, and the persons mentioned in section 4 appearing in said list of firemen exempted by law from jury-service."

We think the court erred in thus excusing any of said *venire* from attendance, and in informing them that they would be excused. After the attendance of the jurors at the time and place designated in the *venire facias*, the court could discharge or excuse one or more of them for cause, or because they were exempt from jury-service and claimed such exemption; but it had no authority before that time to excuse their attendance, as was done in this case. The manner of testing the qualifications of the persons on said special *venire*, as jurors, is plainly prescribed by the statute. The court is the judge, after a proper examination, of the qualification of a juror, or as to whether or not he should be excused for cause, or because he was exempt from jury-service. In forming a jury in a capital case, the names of the persons summoned should be called in the order they stand upon the list, and, if present, they should be tested as to their qualifications; and unless they are excused for cause, or unless exempt from jury-service, and claim such exemption, or unless peremptorily challenged, should be empan-

elled on the jury. The court has no more power or legal authority to excuse any one of the special *venire* before his name is called regularly, at the proper time, in open court, to test his qualifications as a juror in the cause, than it has to decide, in advance, any other legal question when the parties are not before the court, or the case called for trial.

The next error assigned is not well taken. The juror Godshall, who is referred to in this assignment, when he was examined touching his qualifications as a juror, stated that he rented a room and boarded. The object of the question to which the answer was made being to ascertain whether he was a freeholder or householder, his answers show that he was a competent juror.

What we have already said disposes of the fifth error assigned.

The record does not sustain the next assignment in regular order. From the recitals in the judgment, it appears that in this case, on November 19, 1878, "the defendant was arraigned in open court, the indictment read by the clerk, charging the said defenaant with the crime of murder, and he was then asked how he pleaded to said charge, guilty or not guilty; to which he pleaded not guilty, when the case was called for trial." The judgment further recites that, after the jury were duly tried, empanelled, and sworn in said cause, the indictment was again read to him, charging the defendant with the crime of murder, to which he pleaded not guilty.

The court is required by law, in every case of felony, whether asked or not, to deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case. Pasc. Dig., art. 3059. In this case, the court instructed the jury as to the definition of murder in the first and second degrees, but failed to instruct them as to any of the lower grades of culpable homicide, or as to

the law of homicide in self-defence. The question, then, is, Was there any evidence before the jury which required a charge upon the law of manslaughter or justifiable homicide?

If the facts proved create a doubt that the homicide might be a case of manslaughter or of justifiable homicide, then the court, in its charge to the jury, should have given them an opportunity to pass upon that doubt. In a doubtful case, the court must not solve that doubt resting on the facts; for, if it does, and this court affirm the judgment of the lower court, that court and this will decide doubtful facts, and the right of trial by jury will be practically gone. *Halbert* v. *The State*, 3 Texas Ct. App. 661; *Sutton* v. *The State*, 2 Texas Ct. App. 344; *Marshall* v. *The State*, 40 Texas, 200.

So far as appears from the record, there was no person who saw the defendant and the deceased at the time the fatal shot was fired. Under the testimony in the case, we believe that the court below should have charged the jury on the law of manslaughter and of justifiable homicide. For the several errors pointed out in this opinion, the judgment must be reversed.

There is another question which we cannot pass in silence. The indictment, as copied in the transcript, charges that the offence was committed " on the twenty-eighth day of November, in the year of our Lord one thousand, eight thousand, eight hundred and seventy-four." However manifest it may appear that the date of the commission of the offence, as charged in the indictment is a clerical mistake committed in the preparation of the transcript, this court will reverse the judgment when the transcript shows that the offence is charged to have been committed subsequent to the indictment. It is better that the judgment should be reversed, than to establish such a

precedent, or encourage carelessness in the preparation of so important a part of the record to be brought to this court as the indictment.

The judgment of the District Court is reversed, and cause remanded.

*Reversed and remanded.*